Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno: Kevin Mead, 212-637-2211

# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

| United States of America | )  |
|---|---|
| v. | ) Case No. 24 MAG 1492 |
| David Eligoola | ) **24-2723-MJ-GOODMAN** |
| *Defendant* | ) |

FILED BY MP D.C.
Apr 16, 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* David Eligoola,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☑ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

Title 18, United States Code, Section 1956(h) (money laundering conspiracy).

Date: 04/13/2024

*Issuing officer's signature*

City and state: New York, New York

Hon. Sarah Netburn USMJ
*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |

| | |
|---|---|
| **24-2723-MJ-GOODMAN**<br>UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID ELIGOOLA,<br><br>Defendant. | AUSAs: Micah Fergenson, Kevin Mead<br><br>**24 MAG 1492**<br><br>**SEALED COMPLAINT**<br><br>Violation of 18 U.S.C. § 1956(h)<br><br>COUNTY OF OFFENSE:<br>NEW YORK<br><br>FILED BY ____MP____ D.C.<br>**Apr 16, 2024**<br>ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S. D. OF FLA. - MIAMI |

SOUTHERN DISTRICT OF NEW YORK, ss.:

LARISSA MONTES, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
**(Money Laundering Conspiracy)**

1. From at least in or about June 2022 up to and including in or about July 2023, in the Southern District of New York and elsewhere, DAVID ELIGOOLA, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

2. It was a part and an object of the conspiracy that DAVID ELIGOOLA, the defendant, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, would and did conduct and attempt to conduct a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of narcotics trafficking, in violation of Title 21, United States Code, Section 841, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h).)

**Summary**

3. The father ("CC-1") of DAVID ELIGOOLA, the defendant, arranged to launder money for an individual he understood to be working on behalf of drug cartels in South America, who was, in truth and in fact, an undercover agent with the FBI ("UC-1"). Specifically, UC-1 gave CC-1 large amounts of cash, and CC-1 transferred the funds back to UC-1 via cryptocurrency and

bank wires. CC-1 specifically asked UC-1 if the money constituted drug proceeds, and UC-1 said yes. CC-1 laundered over half a million dollars represented by UC-1 to be narcotics proceeds.

4.      That half a million dollars was transferred by undercover agents in cash over several transactions to, variously, DAVID ELIGOOLA, the defendant, CC-1, and an additional coconspirator. ELIGOOLA personally received two cash handoffs—one of $60,000 on March 22, 2023, and one of $116,000, on May 22, 2023. In ELIGOOLA's conversations with those undercover agents, it was clear that he understood that the cash represented proceeds of narcotics trafficking that he was assisting in laundering.

### CC-1's Initial Conversations with FBI Undercover Officers

5.      In or about June 2022, UC-1 began communicating with CC-1 by phone.[1] UC-1 and CC-1 discussed UC-1 transferring money to CC-1.

6.      On or about January 17, 2023, CC-1 and UC-1 met in person. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a.    CC-1 discussed how he could receive any amount of cash and could transfer it back to UC-1 within five days.

   b.    CC-1 said that if he received cash from UC-1 in New York and transferred it back to a New York bank account, he would charge a rate of 10 to 12 percent.

   c.    CC-1 said that an individual working for him would pick up the cash from UC-1.

   d.    CC-1 said that UC-1 should tell him what CC-1 should tell his bank about why he was wiring the money to UC-1.

   e.    CC-1 asked if the cash that UC-1 planned to give him was "from drugs." UC-1 said yes, that the money was from drugs, and that he was "dealing with Colombians."

   f.    CC-1 told UC-1 he would charge a lower fee if UC-1 would accept cryptocurrency in exchange for his cash.

   g.    CC-1 told UC-1 that they should use encrypted messaging applications to discuss their transactions.

   h.    CC-1 told UC-1 that when UC-1 received the wires from CC-1, "the bank will never ask you a question."

7.      On or about February 14, 2023, CC-1 and UC-1 met in person in New York, New York. That meeting was consensually recorded. Based on my review of the recording and my

---

[1] The communications involving FBI undercover agents were recorded, and I know about those communications from reviewing the recordings and reports summarizing the recordings.

discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

      a.    CC-1 told UC-1 that he could launder up to $1 million in cash per day if CC-1 could transfer the money back to UC-1 in the form of cryptocurrency.

      b.    UC-1 offered to hand CC-1 $28,000 in cash at the meeting, in order for CC-1 to launder that cash, but CC-1 told UC-1 that the amount of money was too small, and he would not accept less than $50,000 in cash at a time.

      c.    UC-1 and CC-1 discussed that UC-1 would shortly transfer cash to CC-1, and that CC-1 would return the money to him in the form of cryptocurrency and a bank wire.

      d.    CC-1 and UC-1 discussed what they would tell the bank about the wire transfers. In that context, CC-1 told UC-1 to tell him what UC-1's company was doing. I understand from my training and experience and my involvement in this investigation that CC-1 asked this question in order to effectively deceive the bank when he made a money laundering transfer to UC-1's company.

### The First Money-Laundering Transaction of $60,000

8.    On or about March 22, 2023, DAVID ELIGOOLA, the defendant, met with UC-1. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

      a.    UC-1 and ELIGOOLA met at a restaurant. Shortly after meeting UC-1, ELIGOOLA had a short video call with CC-1 in the presence of UC-1.

      b.    After the call, UC-1 confirmed that ELIGOOLA was "familiar with everything." UC-1 explained that he had "60" on him—*i.e.*, $60,000 in cash—which was part of an "initial test" to see "how fast" CC-1 would return the laundered funds.

      c.    UC-1 requested that, in addition to cryptocurrency, part of the laundered funds be returned via a bank wire. UC-1 stated that his "friend in South America" was also interested in bank wires. ELIGOOLA replied that this arrangement should not be a problem.

      d.    UC-1 said he would also discuss the arrangement with CC-1, but did not like talking about such things over the phone. ELIGOOLA stated he would tell CC-1 what UC-1 told him. UC-1 said he would also send CC-1 a note.

      e.    UC-1 then handed ELIGOOLA a bag containing approximately $60,000 in cash. After receiving the bag, ELIGOOLA left for approximately ten minutes to count the cash. CC-1 then returned and confirmed to UC-1 that it was all there.

9.    Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days after the March 22, 2023, meeting between UC-1 and DAVID ELIGOOLA, the defendant, UC-1 received approximately $45,000 in cryptocurrency

and a bank wire for approximately $9,000 into accounts that UC-1 had provided to CC-1, from an account held in the name of another individual. These transfers reflected that CC-1 had taken a fee of approximately 10% of the $60,000 that CC-1 laundered on UC-1's behalf.

### The Second Money-Laundering Transaction of $100,000

10. On or about April 27, 2023, a coconspirator not named herein ("CC-2") met with an additional FBI undercover agent ("UC-2") for a money exchange that had been arranged by UC-1 and CC-1. The meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

    a. UC-2 handed CC-2 approximately $100,000 in cash.

11. Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days later, UC-1 received approximately $50,000 in cryptocurrency and a bank wire for approximately $41,000 into accounts that UC-1 had provided to CC-1. UC-1 therefore paid CC-1 a fee of approximately 9% of the $100,000 that CC-1 laundered on UC-1's behalf.

### The Third Money-Laundering Transaction of $116,000

12. On or about May 22, 2023, DAVID ELIGOOLA, the defendant, met with UC-2 for a money exchange that had been arranged by UC-1 and CC-1. The meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

    a. Upon meeting ELIGOOLA in UC-2's car, UC-2 apologized for being late, and explained that UC-2 "had to meet up with our other cartel guys here to get the money."

    b. UC-2 handed ELIGOOLA a white plastic bag containing approximately $116,000 in cash. While still in UC-2's car, ELIGOOLA proceeded to count the $116,000 in cash.

13. Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days later, UC-1 received approximately $60,000 in cryptocurrency and a bank wire for approximately $45,000 into accounts that UC-1 had provided to CC-1. UC-1 therefore paid CC-1 a fee of approximately 9% of the $116,000 that CC-1 laundered on UC-1's behalf.

### The Fourth Money-Laundering Transaction of $120,000

14. On or about June 14, 2023, CC-1, and UC-1 met in person in New York, New York. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

    a. UC-1 handed CC-1 approximately $120,000 in cash.

    b. CC-1 told UC-1 that he was disappointed that UC-1 was transferring such small amounts of cash to him, and said that he had expected to be receiving $1 million per week from him.

  15. Based on my review of financial records and my discussions with other law enforcement officers, I know that several days later, UC-1 received approximately $100,000 in cryptocurrency and a bank wire for approximately $8,000 into accounts that UC-1 had designated to CC-1. UC-1 therefore paid CC-1 a fee of approximately 9% of the $120,000 that CC-1 laundered on UC-1's behalf.

### The Fifth Money-Laundering Transaction of $150,000

  16. On or about July 21, 2023, CC-1, UC-1, and other undercover FBI agents met in person in Miami, Florida. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

    a. UC-1 handed CC-1 approximately $150,000 in cash.

  17. Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days after the July 21, 2023, meeting between CC-1, UC-1, and other undercover FBI agents, UC-1 received approximately $90,000 in cryptocurrency and two bank wires totaling approximately $45,000 into accounts that UC-1 had designated to CC-1. UC-1 therefore paid CC-1 a fee of approximately 9% of the $150,000 that CC-1 laundered on UC-1's behalf.

  WHEREFORE, I respectfully request that a warrant be issued for the arrest of DAVID ELIGOOLA, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s authorized electronic signature
_____
LARISSA MONTES
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means, this 13 day of April, 2024.

_____
THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York